**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **THERAPURE BIOPHARMA, INC.,** | * |
| **Plaintiff,** | * |
| **v.** | * |
| **DYNPORT VACCINE COMPANY LLC,** | * |
| | * |
| **Defendant.** | |

**Civil Action No. RDB-19-2092**

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

At issue in this case is an agreement between Plaintiff Therapure Biopharma, Inc. ("Plaintiff" or "Therapure") and Defendant DynPort Vaccine Company LLC ("Defendant" or "DVC") with respect to a subcontract to provide goods and services in connection with the development of a nerve agent antidote for military and commercial purposes. Therapure alleges that DVC failed to meet its obligations under the parties' contract and asserts four claims in its Amended Complaint against DVC: breach of contract (Count I); quantum meruit (Count II); and unjust enrichment (Counts III and IV). Presently pending is Defendant's Motion to Dismiss Plaintiff's Amended Complaint. (ECF No. 31.) The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, Defendant's Motion to Dismiss (ECF No. 31) shall be GRANTED IN PART and DENIED IN PART. Specifically, Counts II, III, and IV will be DISMISSED.

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found.*

*v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).  The Court may consider only such sources outside the complaint that are, in effect, deemed to be part of the complaint, for example, documents incorporated into the complaint by reference and matters of which a court may take judicial notice.  *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

Plaintiff Therapure is a privately held business organized and existing under the laws of Ontario, Canada with its principal place of business and headquarters in Mississauga, Ontario.  (Am. Compl. ¶ 9, ECF No. 27.)  It consists of two business units: (1) a Contract Development and Manufacturing Organization that provides a range of therapeutic protein development manufacturing services and (2) a product unit "focused on commercializing plasma proteins derived primarily using its proprietary technology."  (*Id.*)  Defendant DVC is a corporation organized under the laws of Virginia, with its principal place of business and headquarters in Frederick, Maryland.[1]  (*Id.* ¶ 10.)  DVC manages product development programs for the United States and international government entities and provides consulting services to biotechnology and pharmaceutical companies.  (*Id.*)

## I.     The Basic Ordering Agreement

In or around May of 2013, Therapure and DVC entered into a Basic Ordering Agreement ("BOA"), under which Therapure was subcontracted by DVC to provide certain goods and services in support of the development of a nerve agent antidote.  (*Id.* ¶¶ 1, 13, 18; BOA, ECF No. 31-4[2].)   DVC had the prime contract with the Department of Defense

---

[1] This Court has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a) and the diversity of citizenship between the parties.

[2] The Court may properly consider "any document that the defendant attaches to its motion to dismiss if the document was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge

("DoD") to develop the antidote.[3]   (Am. Compl. ¶ 1.)   Therapure alleges that, under the subcontractor's proposal incorporated by reference in the BOA, the parties agreed to certain assumptions regarding the paste material that would be used in the clinical trials for the approval of the nerve antidote.   (*Id.* ¶¶ 15, 17, 19.)   Specifically, Therapure alleges that the proposal included the following assumptions about the paste: "DVC would deliver Cohn Fraction IV-4 paste, meeting acceptance criteria outlined by Therapure; DVC-procured Cohn Fraction IV-4 paste would be sourced from FDA-approved collection centers, would meet FDA requirements, and would have undergone testing for pathogens; and would meet certain requirements regarding average yield, failure rate, and purity."   (*Id.* ¶ 17.)

Therapure alleges that the BOA requires DVC to reimburse Therapure for various performance-related costs and that the BOA establishes procedures for Therapure to submit Requests for Equitable Adjustments ("REAs"), seeking recovery of additional unexpected costs for which it believes DVC is liable.   (*Id.* ¶ 20.)   The BOA also contains a "quality assurance" provision, requiring that the goods and services are developed according to the terms of the BOA and the applicable task order.   (*Id.* ¶ 21.)   In addition, the BOA contains a "Notice of Delay" provision and "invoice instructions."   (*Id.* ¶ 22; BOA, ECF No. 31-4.)   The Notice of Delay provision provides, "[i]n the event that DVC has knowledge that any actual

---

its authenticity." *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 648 (D. Md. 2015) (quoting *CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009)).   The Court will consider the BOA, attached as an exhibit to Defendant's Motion to Dismiss, because Plaintiff explicitly relies on the BOA in its Amended Complaint: "This action raises out of a basic ordering agreement ('BOA' or 'subcontract') entered into by Therapure and Defendant in May 2013…." (*See* Am. Compl. ¶ 13, ECF No. 27.)   The Court will also consider the License Agreement (ECF No. 31-5), which Plaintiff also incorporates by reference in the Amended Complaint: "through a separately executed license agreement attached to the BOA, Therapure insisted that Defendant agree that Therapure would retain certain commercial rights to manufacture the developed Bioscavenger product."   (Am. Compl. ¶ 25.)

[3] The DoD is not a party to this litigation.

situation may delay or threaten to delay the timely performance of this Subcontract…DVC shall, within five (5) business days provide written notification to Therapure's Project Manager of the nature of the anticipated delay." (*Id.*)   The invoice instructions provide that DVC would pay Therapure "the amounts specified" by Therapure "in duly prepared and submitted invoices, subject to the resolution of any questions the Contractor may have about the services performed or amounts invoiced." (*Id.*)

Finally, Therapure alleges that the BOA contains specific procedures regarding the resolution of disputes, none of which cite, quote, contain, reference, or incorporate the "Disputes Clause" of the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 52.233-1. (Am. Compl. ¶ 24.)   Instead, Therapure alleges that, under the BOA, "any disputes that do not involve a decision by the contracting officer with respect to the prime contract 'shall be decided by DVC,' unless Therapure notified DVC within thirty days that it disagreed with such decision, in which case Therapure 'may proceed to have the dispute settled through appropriate legal action.'"   (*Id.* ¶ 23.)   Therapure alleges that it would not have executed the BOA absent retention of certain commercial rights to manufacture the developed product, which was also memorialized in a separate License Agreement between Therapure and DVC. (*Id.* ¶¶ 25, 26; License Agreement, ECF No. 31-5.)   Therapure estimates the revenue opportunity associated with these rights as worth approximately $100 million per year. (*Id.*)

## II.   Therapure "stands ready"

Therapure alleges that DVC issued stop work orders on at least two separate occasions throughout the course of contract performance, during which Therapure was obligated to maintain a "stand ready" state. (Am. Compl. ¶ 28.)   This "stand ready" state required

Therapure to maintain resources, including personnel, to immediately recommence performance of the contract when directed. (*Id.*) Therapure alleges that it was the parties' pattern, practice, and course of conduct for Therapure to submit REAs to DVC for the unexpected costs associated with these delays, for which DVC would evaluate, sign, and execute the requests and, in turn, submit them to the DoD for execution and payment. (*Id.* ¶¶ 28, 29.)

One of the "stand ready" occasions occurred in or around 2015, when Therapure alleges that the paste product provided by DVC was not viable and contract performance could not continue without obtaining a new paste product. (*Id.* ¶ 30.) Performance was put on hold for approximately nine months because of DVC's alleged delay in resolving the issue. (*Id.*) DVC's alleged failure to provide adequate paste resulted in ongoing and continuing delays to contract performance, lower yield, and more than $12 million in costs to Therapure. (*Id.* ¶ 31.) Specifically, Therapure alleges that, in or around 2017, DVC provided aged paste that had become or was close to becoming unsuitable and unstable and that DVC insisted that Therapure use the aged paste over Therapure's objections, resulting in Therapure having to absorb the cost of its failed experiments. (*Id.* ¶ 35.) On or about July 13, 2018, Therapure submitted a Request for Equitable Adjustment to DVC for the period of March 2017 to May 2018 for "Total Lost Opportunity Due to Paste Age and Quality and Funding Limitations" in the amount of $12,051,451.16. (*Id.* ¶ 36.) Therapure alleges that DVC has failed to reimburse Therapure for this amount owed and resulting from DVC's refusal to provide proper quality paste. (*Id.*)

On or about May 24, 2018, DVC issued another stop work order to Therapure "due to limited funding from DoD." (Am. Compl. ¶ 37.) Therapure alleges that it had almost successfully developed a viable product when this stop work order was issued. (*Id.*) Therapure was required to remain in a "stand ready" state for re-initiation at any time upon removal of the stop work order by DVC, which Therapure alleges caused it significant additional costs. (*Id.* ¶ 38.) Starting on or about July 13, 2018, Therapure submitted the first in a series of Requests for Equitable Adjustments for $1,776,526.13 in costs incurred as a result of the stop work order and Therapure having to maintain necessary contract resources in its "stand ready" state. (*Id.* ¶ 39.) Therapure submitted additional REAs on August 1, 2018 for $1,914,650.22, August 30, 2018 for $1,914,650.22, and October 1, 2018 for $1,701,416.98, for its continued "stand ready" state as a result of DVC's ultimately extending the stop work order until January 25, 2019. (*Id.* ¶¶ 40-46.) The REAs covered resource costs, suite maintenance costs, and expired material costs. (*Id.*)

On or about October 4, 2018, DVC allegedly agreed to submit Therapure's REAs to the DoD for reimbursement. (*Id.* ¶ 47.) DVC also requested additional documentation from Therapure to substantiate the costs identified, which Therapure provided to DVC on or about October 29, 2018. (*Id.* ¶ 48.) On or about November 5, 2018, Therapure submitted an invoice proposal for $6,401,836.77, outlining the estimated future costs associated with maintaining its "stand ready" state from the period of October 2018 until January 25, 2019. (*Id.* ¶ 49.) Therapure submitted another REA on or about January 2, 2019 for costs incurred in October, 2018 and November, 2018 in the amount of $3,364,464.36. (*Id.* ¶ 51.) On or about January 30, 2019, DVC extended its stop work order another 30 days, until February 25, 2019. (*Id.* ¶

54.)   On or about February 11, 2020, Therapure submitted an REA for costs incurred in December, 2018 and January, 2019 in the amount of $2,676,143.30.  (*Id.* ¶ 55.)

Therapure alleges that, consistent with the parties' course of conduct, Therapure's Chief Financial Officer ("CFO") did not sign any of the REAs until after receiving confirmation that DVC agreed to them, but the CFO did provide a certification that "the request is made in good faith, and that the supporting data are accurate and complete to the best of [his] knowledge and belief."  (*Id.* ¶¶ 56, 57.)   In the course of discussions with Therapure over the REAs, DVC allegedly never objected to Therapure's failure to affix a signature and DVC ultimately partially paid one of the REAs at issue that did not contain a signature.  (*Id.* ¶ 58.)

During the entirety of this stop work period, which lasted nearly ten months, Therapure alleges it consistently demanded payment from DVC but had not received any payments as of February, 2019.  (Am. Compl. ¶ 60.)   In a March 12, 2019 letter, Therapure sought payment from DVC for $13,381,762.39 in outstanding amounts due as set forth in the REAs.  (*Id.* ¶ 61.)   In a March 22, 2019 conference call between Therapure, DVC, and the DoD, Therapure alleges that DVC never objected to the lack of signature on the REAs and that "it was clear during the discussion that DVC had in fact provided at least some of Therapure's REAs and supporting documents to the DoD."  (*Id.* ¶ 62.)

## III.   Termination of the BOA

On or about March 13, 2019, DVC issued to Therapure a notice of termination of the BOA. (Am. Compl. ¶ 63.)   Subsequently, the parties engaged in numerous meetings and communications, during which Therapure continued to provide documents in support of its

7

REAs, and DVC and the DoD allegedly promised Therapure that DVC would begin payment of some of the REAs.  (*Id.* ¶ 64.)  On or about May 1, 2019, Therapure submitted an "Alternative Analysis REA" for the period of May, 2018 through January, 2019 in the amount of $13,059,944.64, a calculation it performed to show the legitimacy of its original eight REAs. (*Id.* ¶ 65.)  On or about May 30, 2019, Therapure returned to DVC all of its requested inventory items in accordance with the termination of the contract.  (*Id.* ¶ 66.)

On or about May 27, 2019, Therapure submitted to DVC a Termination Proposal requesting additional compensation of $4,660,754.31, which it alleges included allowable and allocable termination costs associated with its subcontractor close-out costs, material destruction, equipment removal, transportation, storage, facility repairs, idle facilities, and other continuing, accounting, legal, and clerical costs.  (*Id.* ¶ 67.)  In or around June, 2019, DVC issued Therapure a payment of $126,882.27.  (*Id.* ¶ 64.) However, Therapure alleges that DVC has otherwise failed to reimburse it for the remaining costs of the REAs and the termination costs.  (*Id.* ¶ 68.)

On July 16, 2019, Therapure filed this action against DVC, asserting both contractual and quasi-contractual claims.  (ECF No. 1.)  On August 26, 2019, Therapure filed its Amended Complaint.  (Am. Compl., ECF No. 27.)  On September 18, 2019, DVC filed the presently pending Motion to Dismiss.  (ECF No. 31.)

## STANDARD OF REVIEW

A motion to dismiss for failure to exhaust administrative remedies is governed by Federal Rule of Civil Procedure 12(b)(1), which requires dismissal when the court lacks subject matter jurisdiction. *Khoury v. Meserve*, 268 F.Supp.2d 600, 606 (D. Md. 2003); *Clarke v.*

*DynCorp Intern. LLC*, 962 F.Supp.2d 781, 786 (D. Md. 2013). The plaintiff bears the burden to show that subject matter jurisdiction exists. *Piney Run Preservation Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 523 F.3d 453, 459 (4th Cir. 2008).

A motion to dismiss for failure to state a claim is governed by Rule 12(b)(6), which authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016). The sufficiency of a complaint is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009).

While ruling on motion to dismiss, a court's evaluation is generally limited to allegations contained in the complaint. *Goines v. Calley Cmty. Servs. Bd.*, 822 F.3d 159, 166-67 (4th Cir. 2016). However, courts may also consider documents explicitly incorporated into the complaint by reference. *Id.* at 166 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). In addition, a court may "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's

authenticity." *Id.* (citing *Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011) (citation and emphasis omitted). Considering such documents does not convert a motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

## ANALYSIS

Counts I, II, and III of the Amended Complaint allege that DVC failed to pay the amounts Therapure sought in its REAs and in its Termination Settlement Proposal.  Count IV of the Amended Complaint alleges that DVC interfered with Therapure's realization of its commercial rights to manufacture the developed nerve agent product.  DVC advances both procedural and substantive grounds for dismissal of the Amended Complaint, asserting that Therapure has failed to exhaust its administrative remedies under the terms of the Basic Ordering Agreement ("BOA") and as provided for in governing Federal Acquisition Regulations.  DVC also argues that Therapure has failed to state claims for relief under Rule 12(b)(6).  As a preliminary matter, the parties agree that Virginia law governs the Basic Ordering Agreement and its performance and that New York law governs the License Agreement.  (*See* BOA § H-24, ECF No. 31-4.; License Agreement § 11.1, ECF No. 31-5.)

### I.     Rule 12(b)(1) Motion to Dismiss

DVC asserts that Counts I (breach of contract), II (quantum meruit), and III (unjust enrichment) should be dismissed for lack of subject matter jurisdiction because Therapure failed to exhaust its administrative remedies.  Specifically, DVC maintains that the BOA

required Therapure to submit to DVC executed certifications attesting to the veracity of Therapure's REAs and its Termination Settlement Proposal in order for DVC to submit Therapure's requests to the DoD and allow the DoD's contracting officer the opportunity to resolve the issue administratively.   DVC relies on the Disputes Clause of the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 52.233-1, which requires a determination from the Government's contracting officer regarding any requested payments before filing suit. Therapure, on the other hand, asserts that the FAR Disputes Clause does not apply to the BOA because the parties agreed to the specific FAR provisions to incorporate in the contract, and the FAR Disputes Clause was not included.  Instead, Therapure maintains that its claims are properly brought in this Court pursuant to the Disputes section of the BOA which "defines how disputes will be handled."  (*See* BOA § H-12, ECF No. 31-4.)

Under Virginia law, courts must construe contracts in accordance with the parties' intent, typically shown by the language in the contract itself.  *See Pocahontas Mining LLC v. CNX Gas Co.*, 276 Va. 346, 352, 666 S.E.2d 527 (2008) ("A court's primary focus in considering disputed contractual language is to determine the parties' intention, which should be ascertained, whenever possible, from the language the parties employed in their agreement."). Courts must also "construe a document according to its plain terms if it is clear and unambiguous on its face," without looking for meaning "beyond the instrument itself.  *Ott v. L & J Holdings, LLC*, 275 Va. 182, 187, 654 S.E.2d 902, 904-05 (2008).  In determining whether there is ambiguity in the contract, Virginia law requires consideration of the contract "as a whole."  *Pocahontas*, 276 Va. at 353, 666 S.E.2d 527.  In addition, contractual language will not

be rendered ambiguous merely because the parties dispute the meaning of such language. *See Wilson v. Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396 (1984).

The BOA is clear and unambiguous that the parties are to resolve disputes pursuant to Section H-12. (BOA § H-12, ECF No. 31-4.)  Moreover, contrary to DVC's assertion, the BOA does not include the FAR Disputes Clause in the section incorporating FAR clauses. (*Id.* § I.)  Accordingly, Therapure was required to abide by the procedures set forth in Section H-12 of the BOA in resolving its claims and not by the FAR Disputes Clause.[4]

Section H-12 provides specific dispute procedures for different scenarios that may arise.  The first scenario applies only "[i]f a decision on any question of fact or law arising under a Government Contract is made by the Government's Contracting Officer and if such question of law or fact is also related to [the BOA]."  (BOA § H-12(1), ECF No. 31-4.)  The second scenario applies when DVC or Therapure appeals any such decision made by the Government's Contracting Officer.  (*Id.* § H-12(2).)  The third scenario applies when DVC or Therapure is unable to obtain payment from the Government under the Prime Contract "as a result of any decision or judgment that is binding on the Subcontractor and DVC."  (*Id.* § H-12(3).)  Finally, the fourth scenario applies to "any dispute arising under this Subcontract that

---

[4] Even if the FAR Disputes Clause applied, the result would be the same.  Therapure aptly notes that the BOA amends any incorporated FAR clauses by substituting the respective parties in the contract: "The obligations of the Contractor to the Government as provided in said clauses shall be deemed to be the obligations of the Subcontractor to the Contractor."  (BOA § I, ECF No. 31-4.)  Accordingly, if the FAR Disputes Clause had been incorporated, it would have provided: "[a] claim by [Therapure] shall be made in writing and, unless otherwise stated in [the BOA], submitted within 6 years after accrual of the claim to [DVC] for a written decision."  *See* 48 C.F.R. § 52.233-1(d).  In other words, the FAR Disputes Clause would have required Therapure to seek DVC's determination on the REAs and the Termination Settlement Proposal, which it did.  (*See* Am. Compl. ¶¶ 39-62.)

is not covered by [the other scenarios] above and that is not settled by agreement of the Parties." (*Id.* § H-12(4).)

The plain terms of Section H-12 reveal that Therapure's claims are subject to the fourth scenario, as the other three scenarios involve the Government, or the DoD, making a decision with which Therapure or DVC disputes, a situation which is clearly not present in this case. Indeed, there are no allegations that the DoD made any decision relating to the BOA that resulted in DVC's alleged breach.  Accordingly, under Section H-12(4), any such disputes "shall be decided by DVC," and if Therapure disagrees with DVC's decision, it "shall notify DVC within thirty (30) days" and "it may proceed to have the dispute settled through appropriate legal action."  (BOA § H-12(4), ECF No. 31-4.)

Therapure maintains that it followed the requisite dispute procedures.  While it is undisputed that Therapure did not include a signature with any of its submitted REAs or with its Termination Settlement Proposal, Therapure alleges that, consistent with the parties' course of dealing, Therapure's Chief Financial Officer provided a certification that "the request is made in good faith, and that the supporting data are accurate and complete to the best of [his] knowledge and belief."  (Am. Compl. ¶¶ 56-58.)  In the course of discussions with Therapure over the REAs, including during a March 22, 2019 conference call, DVC allegedly never objected to Therapure's failure to affix a signature and DVC allegedly partially paid one of the REAs at issue that did not contain a signature.  (*Id.* ¶¶ 58, 62.)

Virginia law clearly allows parties to modify a contract's terms by their course of dealing, a determination which need not be resolved at this early stage.  *See Stanley's Cafeteria v. Abramson*, 226 Va. 68, 73, 306 S.E.2d 870 (1983) ("a course of dealing by contracting parties,

considered in light of all the circumstances, may evince mutual intent to modify the terms of their contract"). At the dismissal stage, Therapure has adequately alleged that the parties' course of dealing in relation to Therapure's REAs involved DVC accepting the REAs without a signature and submitting some to the DoD for payment. (Am. Compl. ¶¶ 29, 47, 56-58, 62, 64.) When DVC allegedly failed to reimburse Therapure for its REAs and under its Termination Settlement Proposal, Therapure demanded payment from DVC for outstanding amounts due in a letter dated March 12, 2019, consistent with the dispute procedure outlined in Section H-12(4). (Am. Compl. ¶ 61.) That letter allegedly noted that it constituted "notice to DVC that, absent adjudication and payment of all outstanding REAs and the achievement of some understanding between the parties regarding a mutually agreeable path forward, [Therapure] will take immediate action to vindicate its rights under the BOA." (*Id.*)

In sum, the BOA does not require that Therapure exhaust its administrative remedies by first seeking a determination from the Government's contracting officer before filing suit. Accordingly, the Court is satisfied that Therapure has adequately alleged that it followed the applicable dispute procedures and this Court has subject matter jurisdiction over Therapure's claims.[5]

## II.    Rule 12(b)(6) Motion to Dismiss

DVC argues that even if this Court has subject matter jurisdiction over Therapure's claims, Therapure still fails to state claims upon which relief can be granted.

### A.  Breach of Contract (Count I)

---

[5] DVC also asserts that Count IV should be dismissed under either Rule 12(b)(1) or Rule 12(b)(6) because it is subject to binding arbitration. The Court will address this argument as part of its Rule 12(b)(6) analysis *infra.*

To state a claim for breach of contract under Virginia law, a plaintiff must show: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Wells Fargo Bank, NA*, 289 Va. 321, 323, 770 S.E.2d 491, 493 (2015) (quoting *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004)).  The parties do not dispute that the BOA is a valid contract governing this dispute.  DVC, however, asserts that Therapure has failed to sufficiently plead that DVC breached any obligation under the BOA.

In Count I, Therapure alleges that DVC failed to meet its obligations under the BOA by (1) providing inadequate paste as required by Section E-3 of the BOA and Section 3.0 of the Subcontractor's proposal; (2) providing inadequate written notice to Therapure within five business days regarding DVC's knowledge of delays as required by Section F-6 of the BOA; (3) failing to reimburse Therapure for significant costs outlined in its REAs and incurred during the ten-month stop work period pursuant to Sections F-6 and G-2 of the BOA and Federal Acquisition Regulations 252.243-7001 and 7002; and (4) failing to compensate Therapure for its identified termination costs. (Am. Compl. ¶¶ 71-79.)  Therapure also alleges that DVC violated the covenant of good faith and fair dealing by imposing on Therapure new and untenable contract requirements that the parties did not bargain for when they entered the BOA.  (*Id.* ¶ 77.)

Most of these allegations independently suffice to state a claim against DVC for breach of contract.[6]  As to Therapure's assertion that DVC provided inadequate or aged paste,

---

[6] Therapure's allegation that DVC provided inadequate notice pertaining to its knowledge of delays as required by Section F-6 of the BOA is unsupported by the Amended Complaint.  Section F-6 of the BOA provides, "[i]n the event that DVC has knowledge that any actual situation may delay or threaten to delay the timely performance of this Subcontract…DVC shall, within five (5) business days provide written notification

Therapure alleges that the Subcontractor's Proposal, which the BOA "incorporated by reference into any resulting" task order, identified specific criteria for acceptable paste, including the type, source, testing performance, yield, failure rate, and purity. (Am. Compl. ¶¶ 17-19; BOA § A-1, ECF No. 31-4 (incorporating by reference the Subcontractor's Proposal).) Specifically, Therapure alleges that, as required under the BOA and the Subcontractor's Proposal, DVC was required to deliver "Cohn Fraction IV-4 paste…sourced from FDA-approved collection centers" that "would meet FDA requirements, and would have undergone testing for pathogens; and would meet certain requirements regarding average yield, failure rate, and purity." (*Id.* ¶ 17.) Therapure alleges that "in 2015, it became apparent that the paste provided by DVC was not viable and that contract performance could not continue absent obtaining a new paste product" and that in 2017, DVC provided aged paste that had become or was close to becoming untenable and unstable, resulting in costs to Therapure for failed experiments. (*See id.* ¶¶ 30-36.) These allegations suffice to state a claim for breach of contract "that is plausible on its face." *See Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In addition to Therapure's allegations of deficient paste, Therapure sufficiently states a claim for breach of contract based on its allegations that DVC failed to reimburse Therapure for its REAs and termination costs. The BOA incorporates by reference 48 C.F.R. §§ 252.243-

---

to Therapure's Project Manager the nature of the anticipated delay." (BOA § F-6, ECF No. 31-4.) In its brief, Therapure asserts that DVC failed to inform Therapure of "the true 'nature of the anticipated delay'," specifically that DVC needed more time to source acceptable paste for the project. (Therapure Opp'n at 24-25, ECF No. 32.) However, nowhere in the Amended Complaint does Therapure allege that DVC did not notify Therapure of the "true nature" for the delay. *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (plaintiff is "bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"). Accordingly, this allegation does not suffice to state a claim for breach of contract.

7001 and 7002, which require the parties to negotiate and reach agreement on any REAs.  (*See* Am. Compl. ¶ 20; BOA § I, ECF No. 31-4.)  Therapure has alleged in detail the eight REAs submitted to DVC, Therapure's efforts to obtain payment, and DVC's failure to pay.  (Am. Compl.  ¶¶ 39-69.)   Moreover, DVC concedes that "Therapure may be entitled to some equitable adjustment as a result of the stop work orders, as generally provided for in 48 C.F.R. § 252.243-7002."  (Defendant's Mot. at 22-23, ECF No. 31-1.)  DVC's argument that it disputed the accuracy of the costs asserted and that negotiations were ongoing two months prior to the initiation of this lawsuit does not preclude Therapure from stating a claim for breach of contract based on DVC's failure to remit payment for the REAs.

Therapure has also stated a claim for breach of contract based on DVC's alleged failure to pay Therapure for the termination costs as required by the BOA.  (Am. Compl. ¶¶ 63-70.) The BOA provides, "[i]n the event of termination, DVC shall be liable only for the payment of costs incurred for services rendered before the effective date of termination."  (BOA § H-10, ECF No. 31-4.)  DVC terminated the BOA on or about March 13, 2019, and Therapure sought payment for costs incurred for services rendered prior to that date, which it alleges DVC has failed to pay. (Am. Compl. ¶¶ 63, 67.)

Finally, Therapure's allegation that DVC violated the covenant of good faith and fair dealing may also proceed as part of Therapure's breach of contract claim.  As recognized by the United States District Court for the Eastern District of Virginia, "Virginia law on the implied duty of good faith and fair dealing is not exceptionally clear."  *Stoney Glen, LLC v. Southern Bank and Trust Co.*, 944 F. Supp. 2d 460, 465 n.6 (E.D. Va. 2013).  There is authority that "Virginia does not recognize an *independent* action for breach of the implied covenant in

cases that are not governed by the UCC….” *Southern Bank & Tr. Co. v. Woodhouse*, 92 Va. Cir. 402, 410 (2016) (emphasis added).  However, in *Stoney Glen*, the Court noted that “the Fourth Circuit has consistently held that Virginia does recognize an implied duty of good faith and fair dealing in common law contracts.”  944 F. Supp. 2d at 465.  In a recent decision from the United States District Court for the Western District of Virginia, the Court explained that an implied duty of good faith and fair dealing may proceed where “breach of the duty was tied to a breach of contract claim.” *Vance v. Wells Fargo Bank, N.A.*, 291 F. Supp. 3d 769, 775 (W.D. Va. 2018).  Accordingly, Therapure’s allegation that DVC violated the covenant of good faith and fair dealing may proceed as part of Therapure’s allegation that DVC breached the contract by failing to provide adequate paste and failing to pay Therapure for its REAs and termination costs.

To survive a motion to dismiss a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege that defendant acted “arbitrarily, unreasonably, and in bad faith” or “in such a manner as to prevent the [plaintiff] from performing its obligations under the contract.”  *SunTrust Mortg., Inc. v. Mortgages Unlimited, Inc.*, Civil Action No. 3:11CV861-HEH, 2012 WL 1942056, at *3 (E.D. Va. May 29, 2012) (citing Rest. (2d) Contracts § 205 cmt. a (1981)).  Therapure has sufficiently so pled, alleging, *inter alia*, that DVC “strung Therapure along for more than a year, purporting to engage in discussions … while at all times having no intention to actually pay” (Am. Compl. ¶ 77); that DVC “sought to impose on Therapure new and untenable contract requirements which the parties never bargained for…forc[ing] Therapure to incur significant legal expenses which Defendant never

18

reimbursed" (*id.*); and that DVC "falsely implied that it would reimburse Therapure" for the significant costs associated with the "stand ready" state (*id.* ¶ 7).

While DVC endeavors to litigate the merits of Therapure's claims, these arguments will not be entertained at the motion to dismiss stage. *See McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 811 (E.D. Va. 2017) (under Virginia law, "whether the breach of a contractual provision is material is a question of fact best left to the jury"). Accordingly, Defendant's Motion to Dismiss Count I is DENIED.

### B.  Quasi-Contractual Claims (Counts II, III, IV)

Therapure's quasi-contractual claims for quantum meruit (Count II) and unjust enrichment (Counts III and IV) must be dismissed because there are valid contracts governing Therapure's claims. Under either Virginia law, which governs the BOA, New York law, which governs the License Agreement, or Maryland law, where Therapure brought suit, when an express contract governs a dispute, a plaintiff cannot recover for quasi-contractual claims. *Mongold v. Woods*, 278 Va. 196, 677 S.E.2d 288, 292 (Va. 2009); *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 600 N.Y.S.2d 212, 215 (App. Div. 1993); *Ver Brycke v. Ver Brycke*, 379 Md. 669, 843 A.2d 758, 772 n.9 (Md. 2004). Courts in Virginia, New York, and Maryland have all dismissed such claims in this context. *See Luce v. Banach*, 67 Va. Cir. 75, 75 (2005) ("Because liability is based upon an express contract, the causes of action for *quantum meruit* and unjust enrichment are not applicable"); *Katz v. American Mayflower Life Ins. Co. of New York*, 788 N.Y.S.2d 15, 20 (App. Div. 2004) (affirming dismissal of unjust enrichment claim because "Plaintiff alleges the existence of a valid, enforceable contract"); *Quan v. TAB GHA F&B, Inc.*, Civil Action No. TDC-18-3397, 2020 WL 374619, at *5 (D. Md. Jan. 23, 2020) (dismissing

unjust enrichment claim because "the Complaint itself makes clear, and the parties do not dispute, the relationship between the parties is governed by an express contract").

In Counts II and III, Therapure seeks redress in quantum meruit and unjust enrichment for DVC's alleged breaches of the BOA "[t]o the extent that the BOA does not expressly cover Therapure's claims." (Am. Compl. ¶¶ 80-93.)  In Count IV, Thearapure seeks recovery under an unjust enrichment theory for the alleged loss of commercial rights associated with the nerve agent product.  (*Id.*)  Therapure itself alleges that "through a separately-executed license agreement attached to the BOA, Therapure insisted that [DVC] agree that Therapure would retain certain commercial rights to manufacture the developed Bioscavenger product." (*Id.* ¶¶ 25, 94-99; License Agreement, ECF No. 31-5.)  Therapure alleges that it would not have executed the BOA absent retention of certain commercial rights to manufacture the developed product.  (Am. Compl. ¶¶ 25, 26; License Agreement, ECF No. 31-5.)

Counts II and III are foreclosed because the BOA expressly covers Therapure's claims, as discussed *supra*.  These Counts seek redress for the same alleged breaches outlined in Count I, all of which are governed by the express terms of the BOA.  Count IV is also foreclosed because it is governed by the express terms of the License Agreement.  Even if Count IV was governed by the BOA, as Therapure suggests, it would still be foreclosed.[7]  In any event, all

---

[7] Count IV may also be foreclosed on another basis as it is subject to a binding arbitration clause in the License Agreement.  The License Agreement provides that "any dispute, claim or controversy arising out of or relating to this Agreement" must be "resolved through binding arbitration in Washington, D.C. pursuant to the rules of the American Arbitration Association."  (License Agreement §§ 10.1, 10.3, ECF No. 31-5.)  The Federal Arbitration Act reflects a strong federal policy in favor of arbitration and courts must "rigorously enforce agreements to arbitrate."  *Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987).  Accordingly, this Court has consistently dismissed claims that are subject to binding arbitration.  *See Garrett v. Monterey Fin. Servs., LLC*, No. CV JKB-18-325, 2018 WL 3579856, at *2 (D. Md. July 25, 2018); *Muigai v. IMC Constr., Inc.*, Civ. No. PJM-10-1119, 2011 WL 1743287, at *2-5 (D. Md. May 6, 2011); *Cheraghi v. MedImmune, LLC*, Civil Action No. 8:11-CV-01505(AW), 2011 WL 6047059, at *2-4 (D. Md. Dec. 5, 2011).

of Therapure's claims are subject to an express contract between Therapure and DVC, whether the BOA or the License Agreement, precluding any quasi-contractual recovery. Accordingly, Counts II, III, and IV are DISMISSED.

### C. Damages claim

DVC seeks to have the Court declare certain damages unrecoverable because DVC argues that they are barred by limitation of liability clauses in the BOA.[8]  These damages include "lost opportunity" costs as well as attorneys' fees and costs.  (*See* Am. Compl. ¶¶ 34, 36, 78, 69, Request for Relief.)  The BOA provides, "[i]n no event shall either party be liable for any lost profits, lost savings, indirect, incidental, consequential, reliance, exemplary, punitive or special damages, even if a party has been advised of the possibility of such damages," and "[t]he Parties agree to hold each other harmless from any and all … costs and attorneys' fees arising as a result of any breach or failure of either Party to perform … their duties, obligations, and responsibilities under the project."  (BOA § H-13, ECF No. 31-4.)

For its part, Therapure asserts that its damages are not barred because 48 C.F.R. § 52.249-2, which the BOA incorporates by reference, expressly allows for the recovery of costs associated with a party's terminating a contract for "convenience."  (*See* BOA § I, ECF No. 31-4.)  In addition, Therapure maintains that its damages are not barred by the BOA because Therapure's damages are "direct damages," which are compensable.  Whatever the parties may argue is the proper measure of damages in this case, the Court is satisfied that Therapure has properly pled its damages for breach of contract at this stage.  It is simply premature to rule

---

[8] DVC also seeks to enforce the limitation of liability clause in the License Agreement and to preclude Therapure's damages sought in Count IV.  However, because Count IV has been dismissed and the sole remaining Count is based only on the BOA, DVC's request is moot.

upon the issue of damages in the context of a motion to dismiss as there has been no discovery or development of a record in this case.  *See Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) ("the purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.").

## CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss (ECF No. 31) is GRANTED IN PART and DENIED IN PART.  Specifically, Counts II, III, and IV are DISMISSED.

A separate Order follows.


Dated: June 5, 2020


_____/s/_____
Richard D. Bennett
United States District Judge

22