# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THERAPURE BIOPHARMA INC. | * | |
| Plaintiff, | * | |
| v. | * | No. RDB-19-2092 |
| DYNPORT VACCINE COMPANY, LLC | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

On June 9, 2021, Therapure Biopharma, Inc. ("Therapure") and DynPort Vaccine Company, LLC ("DVC") filed a joint letter notifying me about two new discovery disputes. ECF 24. They disputed whether Therapure must respond to DVC's Document Request No. 16 and whether supplemental reports of two Therapure experts, Mary Karen Wills, CPA and Jose Cruz, Ph.D., complied with Fed. R. Civ. P. 26(e)(2). Both parties filed position letters. ECF 126 & 128.[1] On June 15, 2021, I held a conference call.

Having reviewed the filings and heard argument on the call, I will grant Therapure's request to strike DVC's Document Request No. 16, and I will grant in part and deny in part DVC's request to strike the supplemental reports. The supplemental reports are proper insofar as Ms. Wills revised her damages calculations and Dr. Cruz provided information he inadvertently omitted from his initial report. Beyond that, Ms. Wills's supplemental report is stricken because it is not a proper supplement under Rule 26(e). It does not correct or complete her prior reports

---

[1] Plaintiff also filed an exhibit under seal and a motion to seal the exhibit. ECF 127 & 129. Because they contain confidential business information and there is not a less restrictive alternative to sealing, plaintiff's motion is granted. *See* Loc. R. 105.11.

and is not based on facts previously unavailable. In addition, the substance of her supplemental report exceeds the scope of expert opinion. As to Dr. Cruz's supplemental report, it is proper under Rule 26(e) because it is based on facts not available before he submitted his initial expert report.

I.      DVC's Document Request No. 16

On May 27, 2021, the last day of discovery, DVC served its fourth set of document requests. It requested documents regarding any due diligence investigation that Resilience, the company that acquired Therapure in late 2020, performed regarding this dispute. Therapure objected that the request was intended to harass Therapure, citing an email from DVC counsel that stated: "if you insist on pursuing these needlessly harassing and pointless topics, we will not hesitate to propound reciprocal discovery concerning the acquisition of Therapure by Resilience." Pl.'s Ltr. 1 (quoting DVC email, ECF 126-1, at 10). Therapure also objected that the burden of production would be disproportional to the needs of the case. DVC argued the documents may contain relevant party admissions generated during the corporate acquisition due diligence investigation.

Pursuant to Rule 26, parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The party objecting to a discovery request "has the burden of 'clarify[ing] and explain[ing] precisely why its objections are proper given the broad and liberal construction of the federal discovery rules.'" *Gross v. Morgan State Univ.*, No. JKB-17-448, 2018 WL 9880053, at *5 (D. Md. Feb. 9, 2018) (quoting *United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 411 (D. Md. 2005)). Significantly, "[w]hat is discoverable is limited by the requirement of '[p]roportionality[,] [which] requires courts to consider, among other things, whether the burden

2

or expense of the proposed discovery outweighs its likely benefit.'" *In re Verizon Wireless*, No. TDC-19-1744, 2019 WL 4415538, at *4 (D. Md. Sept. 16, 2019) (quoting *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 188–89 (4th Cir. 2019)). The Court also considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, [and] the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(1).

Here, any relevance of the documents is marginal at best. Statements by Therapure during a corporate acquisition due diligence investigation, three years after the contract at issue was terminated and more than a year after this lawsuit was filed, are not particularly important to resolving the claims and defenses asserted here. Moreover, during our conference call, Therapure represented that this litigation was excluded from the due diligence investigation, and, therefore, there likely are no relevant documents. To the extent relevant documents exist, the burden of producing them would outweigh their likely benefit. Therefore, DVC's Document Request No. 16 is stricken. *See* Fed. R. Civ. P. 26(b)(1); *In re Verizon Wireless*, 2019 WL 4415538, at *4.

## II. Therapure's Supplemental Expert Reports

Therapure served two supplemental expert reports, one from Mary Karen Wills, CPA, and one from Jose Cruz, Ph.D. ECF 128-1 & 128-2. DVC agrees that one part of each supplemental report is proper: "Section 2.8 of Ms. Wills's supplement, in which she eliminates $6,053,388 from her damages calculation and reduces by $447,443 another one of her damages amounts," and "Mr. Cruz's reference to two additional GMP runs that were omitted from his initial report 'in an oversight.'" *See* Fed. R. Civ. P. 26(e)(1)(A). Those portions are not stricken.

DVC argues the remainder of these reports should be stricken for failure to comply with Fed. R. Civ. P. 26(e) because the reports do not correct the experts' original reports or state

opinions based on facts not previously available. DVC contends that Ms. Wills's supplemental report amounts to criticism of its expert's deposition testimony and Dr. Cruz's supplement improperly introduces "completely new opinions, formed solely to address [corporate designee Dale] Allen's testimony." Def.'s Ltr. 2. DVC views Dr. Cruz's supplement "as a would-be rebuttal" of statements by a fact—not expert—witness. *Id.*

Therapure contends both reports are proper supplements under Rule 26(e) because "they address new information learned through depositions that ***were not completed until after these witnesses' initial and rebuttal reports were served***." Pl.'s Ltr. 2 (emphasis in original). Specifically, Therapure argues the deposition testimony of DVC's opposing expert Greg Bingham and the deposition testimony of DVC corporate designee Dale Allen provided new information not previously available. Alternatively, Therapure argues the reports should be permitted as untimely expert reports because they do not cause any surprise, dispositive motions deadlines and trial dates have not been set, the information is important to the case, and Therapure could not have provided the supplements any sooner.

Rule 26 provides that, when Rule 26(a)(2)(B) requires disclosure of an expert report, the expert

> must supplement or correct its disclosure or response . . . in a timely manner if the [expert] learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . .

Fed. R. Civ. P. 26(e)(1)(A). An expert's "duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2).

Rule 26(e) imposes a requirement to supplement; it "does not create a 'right to produce information in a belated fashion.'" *EEOC v. Freeman*, 961 F. Supp. 2d 783, 797 (D. Md. 2013) (quoting *Goodbys Creek, LLC v. Arch Ins. Co.*, 07-cv-947, 2009 WL 1139575, at *2 (M.D. Fla. Apr. 27, 2009)), *aff'd*, 778 F.3d 463, 471 (4th Cir. 2015). Nor does it provide an opportunity to augment or revise an expert report "based on criticisms and challenges from the other party." *Dugger v. Union Carbide Corp.*, No. CCB-16-3912, 2019 WL 4754004, at *2 (D. Md. Sept. 30, 2019). The Fourth Circuit has observed that "[t]o construe Rule 26(e) supplementation to apply whenever a party wants to bolster or submit additional expert opinions would wreak havoc in docket control and amount to unlimited expert opinion preparation." *EEOC. v. Freeman*, 778 F.3d 463, 471 (4th Cir. 2015) (quoting *Campbell v. United States*, 470 Fed. App'x 153, 157 (4th Cir. 2012) (internal quotation marks and alterations omitted in *Freeman*))

"[S]upplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Freeman*, 961 F. Supp. 2d at 797 (quoting *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998)). Thus, a supplemental report "may be necessary and proper when new information is obtained." *OmniSource Corp. v. Heat Wave Metal Processing, Inc.,* No. 5:13-CV-772-D, 2015 WL 3452918, at *10 (E.D.N.C. May 29, 2015).

A supplemental report cannot be a "poorly disguised attempt[] to counter [the opposing party's] arguments with new expert analyses." *Freeman*, 961 F. Supp. 2d at 797 (excluding report where the expert's "continually changing analyses [were] based on materials that were available to him prior to his initial submission deadline, not on newly discovered information" and could only be considered a counterargument). Thus, an expert cannot provide a "supplemental report [that] attempts to strengthen or deepen opinions 'in light of [the expert's] opponent's challenges

to the analysis and conclusions therein.'" *Rovid v. Graco Child's Prods. Inc.*, No. 17-cv-1506-PJH, 2018 WL 5906075, at *11 (N.D. Cal. Nov. 9, 2018) (striking expert report on that basis) (quoting *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 499–500 (9th Cir. 2009)).

If an expert provides an "[u]ntimely opinion[] that do[es] not qualify as supplement[al] under Rule 26," the report "may be excluded under Rule 37(c)." *Dugger*, 2019 WL 4754004, at *2; *see Freeman*, 961 F. Supp 2d at 797; *Rovid*, 2018 WL 5906075, at *11.

> Rule 37(c)(1) provides that a party that fails to disclose information "is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The non-disclosing party bears the burden of establishing the nondisclosure was substantially justified or harmless. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014). The "basic purpose" of Rule 37(c)(1) is to prevent surprise and prejudice to the opposing party. *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003).
>
> In *Southern States*, the Fourth Circuit set out a five-factor test to determine if non-disclosure was substantially justified or harmless: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." 318 F.3d at 597. District courts have "broad discretion" to decide whether a nondisclosure is substantially justified or harmless and are not required to examine explicitly all of the factors in *Southern States*. *Wilkins*, 751 F.3d at 222.

*Dugger*, 2019 WL 4754004, at *2.

### A. Ms. Wills's Supplement

Ms. Wills's supplemental report is not a proper supplement under Rule 26(e) because it does not correct inaccuracies or complete holes in her prior reports and it is not based on facts previously unavailable. Rather, Ms. Wills's supplemental report is an attack on the credibility and deposition testimony of DVC's opposing expert Greg Bingham. Ms. Wills may not disguise an attack on an opposing expert's testimony as an attempt to comply with an expert's requirement to

6

supplement her incomplete or inaccurate report. *See* Fed. R. Civ. P. 26(e)(2); *Freeman*, 961 F. Supp. 2d at 797; *Rovid*, 2018 WL 5906075, at *11.

Moreover, the report does not serve the purpose of an expert report. In this regard, *Klicos Painting Co. v. Saffo Contractors, Inc.*, No. RDB-15-2505, 2018 WL 2435187 (D. Md. May 30, 2018), provides guidance. There, Klicos and Saffo entered into a contract to perform highway repairs for the Maryland Transportation Authority ("MTA"). *Id.* at *1. The MTA paid Saffo for the work, and Klicos invoiced Saffo for its share. *Id.* Klicos believed Saffo's payments were incomplete, and it sued Saffo for unjust enrichment; Saffo filed a counterclaim for unjust enrichment. *Id.* at *1 & *3. Saffo sought to exclude Klico's expert's testimony that "the value of Klico's work [on] the project equated to 100% of the profits realized by Saffo from Klicos's work." *Id.* at *6.

In deciding whether to exclude Klico's expert's testimony, Judge Bennett observed that "experts might help this Court quantify the profits or understand the parties' contributions to certain project milestones," but experts could not "help this Court determine the appropriate legal standard for measuring an unjust enrichment claim." *Id.* The Court noted the expert opinion at issue "essentially constitute[d] a legal conclusion that is properly reserved for the Court and that would not be helpful to the Court as the finder of fact." *Id.* During a hearing on the admissibility of the opinion, "Klicos acknowledged . . . that it ha[d] no intention of using its experts to offer legal conclusions as to the applicable standard for recovery in this case" and "conceded that it is up to the Court—with the help of counsel—to tell the experts which standard to apply." Consequently, Saffo's objection was moot. *Id.*

Although *Klicos* is not directly on point, its principles apply here. Ms. Wills's supplemental report provides what appears to be her legal analysis of Mr. Bingham's opinions.

7

The report reads like a brief or judicial decision, not an expert report, and certainly not a supplemental expert report meant to correct errors or fill in gaps in prior reports. As in *Klicos*, it is not helpful to the finder of fact.

Finally, Therapure's reliance on *OmniSource Corp. v. Heat Wave Metal Processing, Inc.*, No. 5:13-CV-772-D, 2015 WL 3452918 (E.D.N.C. May 29, 2015), is misplaced. In *OmniSource*, the expert gained a "substantial amount of new information" when "key witnesses" were deposed after the expert provided his initial report. *Id.* at *10. The expert "learned facts previously unknown to him, which allowed him to set certain controls and variables for testing." *Id.* The court concluded that the expert's supplemental report was "a true supplement" and "proper because it [was] based on new information." *Id.* These facts are not presented here. DVC's request to strike all but one portion of Ms. Wills' supplemental report is granted, and the report is stricken consistent with this opinion.

**B.     Dr. Cruz's Supplement**

In contrast to Ms. Willis's supplemental report, Dr. Cruz's supplemental report is a proper supplement because it completes and corrects his initial report with new information not previously available. In his initial report, Dr. Cruz stated Therapure asked him

> to assess whether the paste provided by DVC met the minimum enzyme activity level set forth in Therapure's Proposal for Manufacturing Services dated March 23, 2013 (Therapure's Proposal), and whether the characteristics of the paste provided to Therapure by DVC, including paste age and the temperature at which it was stored, impacted the yield on MS 9 runs.

Cruz Rept. 1, ECF 128-3. His initial "report addresse[d] the manufacturing aspect of [the parties'] contract and, in particular, the MS 9 GMP runs and the impact of the paste supplied by DVC on Therapure's performance and its ability to complete the project in a timely and successful manner." *Id.* at 3. Dr. Cruz noted:

8

>[P]ersonnel from both Grifols and DVC acknowledged the impact of paste age on the manufacturing yield. In an August 24, 2016 email, Dale Allen, DVC – Associate Director, Manufacturing, Testing & Technical Services, noted that DVC and Therapure were evaluating paste stability and the "initial data indicates a downward HuBChE activity trend at storage temperatures -40 C and -80 C over the last several months." He went on to express concern that "we might not have the paste shelf life we hoped to have to logistically support Manufacturing."

*Id.* at 12.

In early May 2021, after Dr. Cruz completed his initial report, Dale Allen, DVC's Associate Director of Manufacturing, Testing, and Technical Services, testified as DVC's Rule 30(b)(6) witness regarding two paste studies that Therapure performed. *See* Pl.'s Ltr. 2; Def.'s Ltr. 2. During his deposition, Mr. Allen provided the company's official position on the two studies, which were completed after Mr. Allen noted the preliminary findings in August 2016. Therapure began one of them, the "Stability Study," in January 2016 and completed it in October 2016. Cruz Rept. 9. Therapure then conducted the other study, the "Stability Summary," in 2017 using past data. *Id.* at 10.

Neither party submitted the deposition transcript, but DVC does not dispute Dr. Cruz's characterization of Mr. Allen's testimony. Specifically, Mr. Allen stated that "the Stability Study was not scientifically valid" and "it would be difficult to apply the Stability Study's small-scale data to large scale runs." Cruz Supp. 2. Mr. Allen also expressed the company's concerns that "the storage conditions and durations for the paste used in this Stability Summary varied" and the summary "did not adequately examine the reuse of resin in the Q column and its potential impact on yields." *Id.* at 2–3.

In his supplemental report, Dr. Cruz discusses Mr. Allen's testimony about DVC's position on these paste studies. *Id.* at 1–3. Dr. Cruz also provides further information about the Stability Study and the Stability Summary to show the fallacies in DVC's position. *Id.* at 3–4.

DVC argues it made a strategic decision not to designate Mr. Allen as an expert and therefore Dr. Cruz may not rebut Mr. Allen's testimony as if he were an expert. But Dr. Cruz does not respond to opinions from Mr. Allen in his supplemental report. He accepts Mr. Allen's testimony as the corporation's official position on the validity and utility of the Stability Study and the Stability Summary, and he addresses this not-previously-disclosed corporate position in his supplemental report.

DVC also argues that Mr. Allen's corporate testimony was not new information because DVC previously produced documents regarding the paste studies. Therapure counters that, while it knew some of the underlying facts regarding the paste studies both companies performed, it did not know DVC's official position on the Stability Study and the Stability Summary until Mr. Allen testified as a corporate designee. I agree with Therapure. Although Therapure previously knew about the paste studies, Mr. Allen's corporate testimony defining DVC's position on the Stability Study and the Stability Summary qualifies as material facts not previously known to Therapure's expert.

To illustrate this point, consider how Mr. Allen's testimony apparently differs from his initial observations in 2016. As noted, Dr. Cruz was asked "to assess whether the paste provided by DVC met the minimum enzyme activity level," which required him to determine whether the "paste age and the temperature at which it was stored, impacted the yield on MS 9 runs." Cruz Rept. 1 & 12. He did so based on the understanding, garnered in part from Mr. Allen's 2016 statement, that "DVC acknowledged the impact of paste age on the manufacturing yield." *Id.* Mr. Allen's testimony suggests that DVC now disagrees about what two of the studies showed. That is, DVC now believes the Stability Study's finding that "the new Grifols paste experienced a significant reduction in HuBChE activity over time" was "not scientifically valid because '[t]he

samples used in the study were held at various temperatures and durations prior to entering the study parameters.'" Cruz Supp. 2 (quoting Allen Dep. 57). Further, Mr. Allen testified that "it would be difficult to apply the Stability Study's small-scale data to large scale runs." Cruz Supp. 2 (citing Allen Dep. 57–58). And, Mr. Allen questioned the Stability Summary's utility, noting "the storage conditions and durations for the paste used in th[e] Stability Summary varied" and asserting that the Stability Summary "did not adequately examine the reuse of resin in the Q column and its potential impact on yields." Cruz Supp. 2 & 3 (citing Allen Dep. 76–78). Thus, Dr. Cruz's initial report was based on DVC's outdated position on the paste studies.

This new information is material. Whether the paste DVC provided to Therapure was viable, as required under the contract, is a hotly contested issue. Therapure alleges that "Defendant repeatedly failed and/or refused to provide proper paste. Not only was contract performance unnecessarily delayed, but Therapure incurred more than $12 million in unreimbursed costs as a result." Am. Compl. ¶ 4, ECF 27. Moreover, Therapure alleges that the Stability Study showed that DVC "continued to provide aged paste that had become or was close to becoming unsuitable and unstable," in violation of "its contractual obligation to provide viable paste required for successful contract performance." Am. Compl. ¶ 35. To prove this allegation, Therapure retained Dr. Cruz, who is expected to testify about "the manufacturing aspect of [the parties'] contract and, in particular, the MS 9 GMP runs and the impact of the paste supplied by DVC on Therapure's performance and its ability to complete the project in a timely and successful manner." Cruz Rept. 3. Thus, DVC's position on the viability of the paste it provided to Therapure is material to Therapure's claims and to Dr. Cruz's opinions.

To correct and complete his initial report, Dr. Cruz's considered DVC's official position provided by Mr. Allen during his deposition, which had not previously been disclosed. Therefore,

it was "necessary and proper" for Dr. Cruz to provide a supplemental report to address DVC's official position on the paste studies. *OmniSource*, 2015 WL 3452918, at *10; *see Freeman*, 961 F. Supp. 2d at 797.

Even if Dr. Cruz's supplemental report contains additional opinions not previously disclosed and is not limited to mere corrections of previously disclosed opinions, the nondisclosure was substantially justified and harmless. *See Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014). An application of the Fourth Circuit's five-factor test in *Southern States* weighs in favor of allowing the opinions. DVC cannot credibly claim surprise. The May 27, 2021 supplemental report was produced on the supplementation deadline and approximately two to three weeks after Mr. Allen's early May deposition. As discussed above, Therapure did not disclose the supplemental report because the 30(b)(6) deposition did not take place until after the initial report was due. Further, the supplemental report concerns important issues relating to Therapure's claims and defenses. The timing of the disclosure will not interrupt or delay trial, as discovery only recently closed and no trial date has been set. Finally, DVC's claims of prejudice are unsupported. DVC deliberately and strategically chose not to designate Mr. Allen or anyone else as a paste expert to respond to Dr. Cruz's testimony. DVC cannot prevent Dr. Cruz's consideration of DVC's position on the paste studies simply because the 30(b)(6) deposition occurred after the deadline for initial expert report disclosures. Such gamesmanship will not be countenanced. Thus, to the extent Dr. Cruz's supplemental report contains new opinions, they are allowed.

With this issue resolved, the parties agree that discovery is closed. However, I will allow DVC to depose Dr. Cruz regarding his supplemental report if DVC elects to do so. DVC may not designate an expert to respond to Dr. Cruz. The deadline for disclosing expert witnesses has long

passed, and DVC deliberately chose not to designate Mr. Allen or anyone else as an expert witness. It may not do so now.

Finally, I will lift the stay jointly requested by the parties so that they could pursue mediation. ECF 119 & 120. A month after their request, they informed me on June 28 that they no longer agree about pursuing settlement, and they proposed a scheduling for briefing cross-motions for summary judgment. ECF 131. Accordingly, the stay is lifted. DVC shall file its motion for summary judgment by August 12, 2021; Therapure shall file its opposition to DVC's motion and cross-motion for summary judgment by September 13, 2021; DVC shall filed its reply in support of its motion and opposition to Therapure's cross-motion by October 13, 2021; and Therapure shall file its reply in support of its cross-motion by November 3, 2021.

## **ORDER**

For the reasons stated in this Memorandum Opinion and Order, it is, this 30th day of June, 2021, hereby ORDERED

1. Therapure's request to strike DVC's Document Request No. 16 is granted;

2. DVC's request to strike Therapure's supplemental expert reports is granted in part and denied in part;

3. The stay is lifted, and the following schedule shall govern the parties' dispositive motions briefing:

DVC's motion for summary judgment:　　　　August 12, 2021

Therapure's opposition to DVC's motion and
cross-motion for summary judgment:　　　　September 13, 2021

| | |
|---|---|
| DVC's reply in support of its motion and opposition to Therapure's cross-motion: | October 13, 2021 |
| Therapure's reply in support of its cross-motion: | November 3, 2021 |

/S/
Deborah L. Boardman
United States Magistrate Judge